NEMAHA NATURAL RESOURCES DISTRICT, A POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA, APPELLANT, V. THE VILLAGE OF ADAMS, GAGE COUNTY, NEBRASKA, ET AL., APPELLEES.

301 N.W.2d 346

Filed January 30, 1981. No. 43201.

Steven G. Seglin of Crosby, Guenzel, Davis, Kessner & Kuester for appellant.

James G. Sharp of Everson, Noble, Wullschleger, Sutter, Sharp & Korslund for appellees.

Heard before BOSLAUGH, McCOWN, CLINTON, and BRODKEY, JJ., and COADY, District Judge.

BOSLAUGH, J.

The plaintiff is a natural resources district. In 1969 its predecessor, a conservancy district, constructed a dam, described as a floodwater retarding structure, "Structure 7A," near the Village of Adams, Nebraska. As a part of the project, the district acquired from the

owners of the land lying north of the dam an easement for the flowage, storage, and temporary detention of waters flowing over or through the dam.

In 1978 the defendent Village constructed a waterline across the land lying north of the dam. As a part of this project, the Village acquired from the landowners a 15-foot easement across the property.

The District commenced this action to enjoin the Village from wrongfully interfering with its easement. The trial court found that the easement of the Village did not constitute an unreasonable interference with the prior easement of the District and dismissed the petition. The District has appealed.

The dam, Structure 7A, is constructed of rolled earth and is approximately 36 feet high, 14 feet wide, and 843 feet long at the crest of the embankment. The centerline of the dam runs to the southeast at an angle of approximately 24 degrees from an east-west line. The dam itself has an estimated life expectancy of 50 years.

The reservoir has a drainage area of 1.74 square miles. The dam was designed to contain a 100-year storm. Water is discharged from the reservoir through a drain when the water level in the reservoir reaches 1,288 feet. An emergency spillway located at the western edge of the dam has an elevation of 1,298 feet at the crest.

The waterline constructed by the Village runs in an east-west direction through the spillway area north of the dam. At its closest point, the waterline is approximately 60 feet downstream from the toe of the dam. The waterline consists of 6-inch plastic pipe buried approximately 5½ feet below the surface of the ground. The line is equipped with a shutoff valve so the line near the dam can be isolated in the event of a break. The pipe is designed to withstand an internal pressure of 200 pounds per square inch and was tested for leakage at a pressure of 120 pounds per square inch after installation.

The pipe was installed by digging a trench 10 inches

wide and approximately 5½ to 6 feet deep. The pipe was assembled at the surface and lowered into the trench. There is evidence that the contractor did not backfill the trench according to the specifications of the contract, and was required to do additional work to remedy settling and erosion in the area of the trench. The evidence is in conflict as to whether the compaction of the backfill of the trench is satisfactory at this time.

The District's theory of the case is that the waterline constitutes a hazard to the dam and should be removed and relaid in a different area. The District argues that in the event of a heavy discharge of water through the emergency spillway of the dam, erosion in the area of the waterline trench might spread and endanger the dam itself, particularly if the waterline should rupture at the same time. The District produced expert witnesses whose testimony tended to support this theory. Expert testimony introduced by the Village tended to prove that no problem of a serious nature existed. At the conclusion of the evidence, the trial court viewed the premises.

Generally, the grant of an easement over land does not preclude the grantor from using the land in any manner which does not unreasonably interfere with the special use for which the easement was acquired. *Minneapolis Athletic Club v. Cohler*, 287 Minn. 254, 177 N.W.2d 786 (1970). This includes the granting of additional easements in the same land. See 25 Am. Jur. 2d *Easements and Licenses* § 89 (1966).

The creation of an easement carries with it by implication only such incidents as are necessary for its reasonable enjoyment. The owner of the servient tenement may use the land for any purpose which does not unreasonably interfere with the rights of the owner of the dominant tenement.

The trial court found specifically that the pipe used for the waterline was sufficient for such purpose with adequate safety factors; that the pipe had been properly assembled and installed; and that the pressure tests

were persuasive of the safety quality of the pipe and its installation. The trial court further found there had been no significant erosion in the area of the trench after the final covering of the waterline, even though the area had been subjected to heavy rainstorms from June through September 1978; that the soil above the pipe compared favorably with the soil used in construction of the spillway; that the ground cover in the trench area was developing satisfactorily; and that the use of the spillway used for overflow water was remote, and if it occurred, would be of short duration. The trial court concluded that the present location and condition of the waterline did not affect Structure 7A or its operation or use; that the waterline had not unreasonably burdened the plaintiff with the necessity for additional inspection and maintenance of Structure 7A; and that the likelihood of damage or danger to Structure 7A and its spillway was so remote as to not constitute an unreasonable interference with the use and safety of Structure 7A and the plaintiff's easement. These findings are fully supported by the record and we adopt them as our findings.

The judgment of the District Court is affirmed.

AFFIRMED.