GLENN E. KOVANDA AND JOEL W. POSPISIL, APPELLEES, V.
DUANE VAVRA AND GREG KRUPICKA, APPELLANTS.

633 N.W.2d 576

Filed August 28, 2001.   No. A-00-448.

Shaylene M. Kolbo and Matthew Hanson, of Steinacher, Vosoba, Hanson & Kolbo, for appellants.

John C. Hurd, of Wolfe, Snowden, Hurd, Luers & Ahl, for appellees.

HANNON, INBODY, and MOORE, Judges.

HANNON, Judge.

## INTRODUCTION

The appellants, Duane Vavra and Greg Krupicka, who were the defendants in the trial court, own an easement to cross the

north 30 feet of an 80-acre field to obtain access to land Vavra owns. The easement is across land owned by one appellee, Glenn E. Kovanda, and rented by the other appellee, Joel W. Pospisil. In 1996, the appellees started to raise corn and to irrigate the part of the 80 acres that was subject to the easement with a center-pivot irrigation system. The use of the irrigation system interfered with the appellants' use of the easement, because when the irrigation system was over any part of the easement, it limited the height of the vehicles and equipment that the appellants could use on the easement. Irrigation also made the easement trail muddy and impassable by various farm vehicles for a couple of days afterward. Animosity arose between the parties, and both parties committed acts which were clearly in violation of the rights of the other party. The central issue of this appeal is the relative rights of the appellants to use the easement to those of the appellees as owner and tenant of the land subject to that easement. The trial court held that the appellees have the right to use their land, so long as that use does not unreasonably interfere with the appellants' use of their easement, and that the appellants had the burden to prove, and failed to prove, that the appellees' operation of the irrigation system was unreasonable under the circumstances. The trial court enjoined the appellants from blocking the irrigation system's path and enjoined the appellees from pushing up dirt or discing the easement area. The appellants now appeal and allege the trial court erred in failing to find that the appellees' activities interfered with their use of the easement and in not enjoining the appellees from such activity. Upon a de novo review, we find that the court erred as alleged by the appellants and modify the trial court's decree to enforce the appellants' rights under the easement as described herein.

## BACKGROUND

In 1995, before the easement in question was granted to the appellants, Kovanda owned land in the southeast quarter of the northwest quarter and the southwest quarter of the northwest quarter of section 7 (north property). This land was irrigated by a center-pivot irrigation system, which pivoted at a point slightly north and west of the center of the northwest quarter, that is,

near the south line of Kovanda's property. This allowed the irrigation system to cover and irrigate a half circle of land on the north property. In early 1995, the west half of the southwest quarter (south property) was owned by Edward Kubicek. The south property is situated immediately south of the north property. In 1995, the two properties were separated by a fence, trees, and bushes. The south property was dryland farm ground.

Vavra owned farmland situated immediately east of the south property. Vavra owned the east half of the southwest quarter (east property). Turkey Creek cuts across the east property, land locking a 10-acre piece of Vavra's land west of Turkey Creek because the creek cannot be forded with vehicles or machinery. Since 1946, Vavra accessed the east property for farming purposes, with Kubicek's permission, by traveling along the north end of the south property along the fence and tree line. Vavra raised row crops of corn, beans, and milo on the east property, and at times, he also kept cattle there. Krupicka's interest in this action is chiefly as a tenant of Vavra's land, but he is also Vavra's grandson and owns unspecified land farther east of the south property and was also a grantee on the easement.

After Kubicek died in 1995, Kovanda purchased the south property at an auction. Just a few days before the sale, Kubicek's personal representative granted the appellants an express, written easement to cross the south property in order to access the east property. Kovanda testified that he knew of this easement when he bought the south property and that he knew of the appellees' use of the easement before it was reduced to writing. The document granted an easement on the west half of the southwest quarter of section 7, and specifically granted

> the right, privilege and easement to Duane Vavra and Greg Krupicka [and] their heirs . . . the right of ingress and egress across the North Thirty feet . . . of the following described real estate, for the purpose of crossing the aforedescribed real estate to get to the property owned or leased by [the appellants] located directly East of the following described real estate. Such right of ingress and egress shall include the right to use any mode of transportation desired . . . including any and all farm machinery and equipment.

Also in the document, the appellants agreed to do "as little damage as possible to the aforesaid premises," to make reasonably satisfactory repairs to restore the premises as far as possible to its condition prior to any damage, to pay for any damages not completely restored, and to indemnify and hold the grantor harmless from any claims from the appellants' use or enjoyment of the easement.

After Kovanda purchased the property, the appellees took down the fence line and cut down the trees and bushes along the border between the north and south properties. The appellees also extended the use of the irrigation system that had originally irrigated only the north property so that it traveled over part of the south property as well. Irrigating the south property in this way caused the irrigation system while in operation to cross the easement.

Pictures of the irrigation system show it has a pipe, suspended approximately 9 or 10 feet from the ground, which carries the irrigation water, and this pipe extends for approximately one-eighth of a mile. The towers holding the pipe in the air are some distance apart. Cables are located under the pipe to make a tress system which supports the pipe between the towers. These cables are the lowest point on the system between the towers. Pospisil testified he measured the distance between a cable and the ground to be 8 feet 9 inches, but it is clear that during irrigation, the towers sink into the ground several inches. This obviously lowers the distances from the cable to the ground, and Vavra testified that he could not drive even his pickup under the irrigation system while it was operating because of this lowered height.

After the extension of the irrigation system's use into the south property, the system covers approximately three-fourths of the circle rather than one-half when used only on the north property, and thereby, the appellees are able to irrigate approximately 24.6 acres of the south property. The diagrams in evidence show that the system pivots on a center point slightly to the north of the east end of the property line between the north and south properties. When in operation, the irrigation system pivots counterclockwise across the south property from its north edge. When it first enters the south property from the north, the

system extends west across the easement and thereby irrigates that area. As the system rotates in a counterclockwise direction, it continually travels over some part of the easement area. Eventually, the system reaches near the east edge of the south property, at which point it extends approximately due south of the pivot point. At that point, it has irrigated all of the south property it can irrigate, and it reverses direction and returns to the north property by traveling back across the south property in a clockwise path.

As the above description and the evidence presented indicate, the irrigation system cannot make a complete circle, primarily because Kovanda does not own the east half of the southwest quarter, Vavra does. This necessitates running the irrigation system both ways around approximately three-fourths of a circle. The system is a type that cannot be moved without irrigating the land as it moves, but the speed at which it travels and the amount of water applied can be increased or decreased as the speed of rotation is decreased and increased. Pospisil testified that the system takes approximately 2½ hours at its top speed to circle in a counterclockwise direction from the easement to the point at which it stops and returns by going clockwise. The system usually returns at 20 percent of its top speed, taking approximately 16 to 20 hours to go the one-fourth pivot needed to return to the north property.

Thus, the heaviest irrigation is done when the system returns in the clockwise direction. Pospisil testified that the slow speed soaks the ground "real well." He admitted that because the system has to run both ways, it "overwater[s]" the area, and that the trail gets muddier than it would if the system could make a complete circle and not rewater the land so quickly. He also testified that it takes a four-wheel-drive vehicle to drive on the easement after it has been watered and that a two-wheel-drive vehicle would probably get stuck. He further admitted that a tractor, cultivator, planter, disc, or sprayer, all farm implements the appellants need to farm the east property, cannot travel across the easement during or after the system has irrigated the south property. He also admitted that the system makes tracks several inches deep where the towers travel. Vavra testified that neither of his pickups fit underneath the pivot while it runs across the

easement and that he has been stuck in the mud a number of times when the trail was wet from irrigating the south property because both of his pickups are two-wheel drive. Pospisil testified that a pickup can drive under the system, but Vavra testified that one of his pickups that has a stockrack on it which he regularly uses cannot go under the system. He also testified that his other pickup will not fit under the system either.

During the time the appellees were altering the south property to be irrigated by the system, the appellees clearly violated the appellants' easement rights by piling trees and dirt upon it; by discing it; and at times, by actually farming the easement area. Vavra also clearly violated the appellees' rights as owners of the servient estate by parking a truck upon the easement. This prevented the appellees from running the system over the easement area. Neither side alleged or prayed for damages for these past wrongs, and the trial court enjoined this type of abuse. Neither side appeals from that part of the trial court's order. Consequently, we shall not summarize these activities, except to the extent it bears on the use of the easement, because such evidence is irrelevant to the issues of this appeal.

After initially trying to farm the easement area, the appellees allowed an uncultivated path approximately 30 feet on the easement area to become packed by travel. The appellees commenced to use that trail as a means of access to their equipment located at the center of the irrigation system. The system still traveled on and across the trail. As it pivoted, the system would be almost directly on the trail along its length as it entered the south property. As the system pivoted south and returned, it remained across some part of the trail.

The length of the irrigation season depends upon the weather, but usually goes from May to August. Pospisil testified that it takes approximately 1 week for the system to irrigate all the land it covers. It does not travel constantly during the season. Pospisil's testimony would establish that the land is irrigated approximately 10 times during a farming season. The system operates across the trail 18 to 20 hours of each irrigation cycle.

The irrigation system broke down or became "stuck" because the ground was so muddy on several occasions, and it stood across the easement for 7 to 8 days each time. Further, Pospisil

sometimes left the system sitting across the easement for 2 to 3 days before having it retrace its path. This meant the system could be across the easement for 4 to 5 days at a time during the irrigation cycle.

Pospisil admitted that the trail would get muddy after the irrigation system had crossed it. He also agreed that the appellants could not get to their land to farm it when the system was irrigating the south property. Pospisil further agreed that a farmer must fertilize, water, and spray at certain times only and that a failure to do so will affect the yield. Vavra testified to several instances in which he found he could not get across the easement to farm or to take care of livestock he kept on the east property. The appellees never denied the appellants' claim that the use of the system interfered with or obstructed the appellants' use of the easement. There is no claim that the appellants have changed their use of the trail or significantly changed their activities on the east property in such a manner as to change or increase the frequency or nature of their need to use the easement.

There was some testimony about whether Turkey Creek could be crossed with trucks or machinery, and the parties disagreed on that point. The totality of the testimony clearly establishes that crossing the creek is not a viable option because of the depth of the creek and its steep banks.

The appellants argued that the appellees' irrigation system interfered with their easement in several respects. First, the system crossed the trail for several hours to several days while irrigating the south property, and Vavra could not pass underneath with his pickup or other machinery. Second, the system's operation made the trail muddy to the point that it was impassable because he had only two-wheel-drive pickups. Third, the system would occasionally break down and stand across the easement for several days at a time in such instances. Fourth, the appellees disced and plowed the easement in more than one farming season and actually planted crops on it during one season.

The record is clear that the parties have been fighting over the use and effect of the easement since Kovanda bought the south property. They were very acrimonious toward each other, but as we have indicated, most of these disputes are simply past history which is largely irrelevant to the issue now before this court. The

appellees filed a petition praying for a temporary restraining order, temporary injunction, and permanent injunction enjoining the appellants from interfering with their operation of the irrigation system. The appellants filed an answer and cross-petition seeking a temporary restraining order, temporary injunction, and permanent injunction enjoining the appellees from obstructing their use of the easement. The matter came for trial on January 10, 2000.

On March 27, 2000, the trial court issued a signed "Memorandum Finding," which was followed by an order entered on April 4. The significant relevant findings and conclusions of law contained in the memorandum were (1) that the appellants hold an easement, but the law gives the appellees the right to use the easement "so long as Plaintiffs' use is reasonable and does not interfere with the Defendants' reasonable use thereof"; (2) that the appellants may cross over the south property, "so long as their use is reasonable and does not interfere with Plaintiffs' reasonable use"; (3) that on its face, the appellees' operation of the irrigation system over the appellants' easement appeared to be reasonable; and (4) that the court considered the evidence and concluded that during the approximately 127-day irrigation season, the system operated approximately every 12 days, on average, and that the easement would be wet for 5 days and then dry for 7 to 10 days.

The trial court cited the appellants' claim that they had been prevented from spraying twice and concluded that "Defendants' right [to use the easement] is subject to Plaintiffs' reasonable right to use the pivot system" and that the appellants had the burden to prove that they could not have crossed the easement during the 10-day dry period or that they could not have made the crossing during "a critical time" and further that such a time period was the proximate cause of some damage. The court went on to address the appellants' claim that they "lost" two calves when the appellants were unable to cross the easement, but it found that they failed to prove what specifically caused the calves' deaths or that any denied use of the easement was the proximate cause. The court also found that the appellees could cross the easement at any time by foot or by a "three or four wheeler . . . vehicle common[ly] used in irrigation fields."

The trial court further observed:

> The following observations are such that the Court, being a rural court, believes that it may consider. Even if considered, they do not seem to be critical.
>
> If wheat were planted on [the east property], there is little chance of conflict because wheat is planted in September and harvested in July. Wheat stubble is not good grazing material.
>
> If corn or milo is planted on those acres, it is likely that the parties' crop season would coincide. Defendants might, in this particular case, want to pasture their harvested bean stalks in July and August but would usually have other stalks available if they plant beans. See exhibit # 3. That exhibit also shows that the cattle herd would not always be located in an area where it would be convenient to use Defendants' right of ingress for checking on the herd.

In the order, the trial court found that the appellants failed to prove that the operation of the irrigation system was unreasonable under the circumstances. Accordingly, the trial court ordered (1) that the appellants were enjoined from obstructing the irrigation system from crossing the easement; (2) that the appellees were enjoined from obstructing the easement by pushing up dirt or other material, discing the easement, planting thereover, or parking the system thereover; and (3) that the appellees were to pay all of the court costs of the litigation. The trial court also found that the appellants had failed to adequately establish proximate causation for any monetary damages.

The appellants subsequently perfected this appeal.

## ASSIGNMENTS OF ERROR

The appellants allege the trial court erred in (1) failing to find that the irrigation system unreasonably obstructed the use of the easement, (2) failing to award the appellants a permanent injunction preventing the appellees from obstructing the easement, and (3) failing to award the appellants monetary damages for losses incurred from the obstruction of the easement.

In regard to the third assignment of error, we observe that the appellants did not plead or pray for an award of damages. In the absence of appropriate pleadings seeking and justifying an

award, a trial court cannot err by failing to award such relief. *One Pacific Place v. H.T.I. Corp.*, 6 Neb. App. 62, 569 N.W.2d 251 (1997) (relief should be confined to that prayed for and that justified by averments of pleadings; pleadings before trial court at time of decision form issues for that decision). We will therefore not further consider the third assignment of error.

## STANDARD OF REVIEW

"An action for injunction sounds in equity. . . . On appeal from an equity action, the appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court." (Citations omitted.) *White v. Board of Regents*, 260 Neb. 26, 33, 614 N.W.2d 330, 336 (2000).

## ANALYSIS

The appellees cite *Shamblen v. Great Lakes Pipe Line Co.*, 158 Neb. 752, 64 N.W.2d 728 (1954), for the proposition that "[a]n easement is usually defined as a right in the owner of one parcel of land, by reason of such ownership, to use the land of another for a special purpose not inconsistent with the general property right of the owner." Brief for appellees at 7. We have thoroughly read that case and do not find that language or any statement reasonably close to it therein. *Shamblen* involved the owner of real estate who sued the easement holder for damages allegedly caused by the easement holder's installing a pipeline. Recovery was sought under the easement holder's promise to pay damages, and the case did not consider the relative rights of the parties except under the terms of the contract. It contains no authority helpful to the resolution of the case at hand.

The appellees also cite and rely upon *Drieth v. Dormer*, 148 Neb. 422, 27 N.W.2d 843 (1947), in which the owner of the servient estate was not held in contempt for flooding the area of a prescriptive easement for a road. *Drieth* so held because the owner of the land was held to have the right to irrigate his land and the waste water interfering with the easement was found to flow naturally and in the usual course of drainage from the irrigation. *Drieth* held that the easement for travel was clearly subject to the burden of being made soft from the waste water

draining from irrigation. The easement in that case was a prescriptive easement, and the issue turned upon the rights that the easement holder acquired by prescription. The easement in this case is in writing, and as the authority cited below holds, the rights of the parties are determined by the words in the easement grant.

We believe the following excerpt summarizes the applicable rules:

> The owner of the servient estate and the owner of the dominant estate enjoy correlative rights to use the subject property, and the owners must have due regard for each other, and should exercise that degree of care and use which a just consideration for the rights of the other demands. . . . [U]se by both must be permitted in accordance with their interests. *So long as the dominant estate receives all of the uses that it bargained for and is entitled to under the easement, equity will not restrict the free and full utilization of the servient estate.*
>
> Unless he expressly agrees to the contrary, the owner of the servient estate may use his property in any manner and for any purpose consistent with the enjoyment of the easement, and the owner of the dominant estate cannot interfere with this use.

(Emphasis supplied.) 28A C.J.S. *Easements* § 165(a) `at 380 (1996). This authority clearly teaches that the court must first determine what right the easement holder received and that then the owner of the servient property can do anything with the land that does not interfere with those rights. These rules apply to rights-of-way, and this authority states:

> [A]n owner whose land is burdened with a right of way, unless he has expressly agreed to the contrary, may use the land over which the way passes in any manner which does not materially impair or unreasonably interfere with its use as a way.
>
> . . . However, the use of the servient owner must be reasonable and not such as will injure, impair, or obstruct the enjoyment of the way by the grantee or subject him to extra labor and expense in keeping it in repair; and the owner of

the way may restrict such use of it by the owner of the servient tenement as is inconsistent with the enjoyment of the easement.

28A C.J.S., *supra*, § 165(b) at 383-84.

When Kovanda purchased the south property, it was unirrigated and farmed as dryland only. The appellees clearly changed and altered the use of the land after Kovanda purchased it. "The owner of the servient estate cannot make any alterations in his property materially interfering with the enjoyment of the easement. . . . The owner of the easement has no obligation to accommodate the servient owner's wrongful alteration of the easement's character." 28A C.J.S., *supra*, § 175 at 393.

The appellants' easement was created by a specific grant. The effect of that grant is clear. The Nebraska Supreme Court has recognized the rights created by such a grant: "[T]he extent of an easement created by such a conveyance is fixed by the conveyance and the meaning thereof is to be found in its language construed in the light of relevant circumstances. Restatement, Property, § 482 . . . § 483[.]" *Bors v. McGowan*, 159 Neb. 790, 799, 68 N.W.2d 596, 602 (1955). " 'The possessor of land subject to an easement created by conveyance is privileged to make such uses of the servient tenement as are not inconsistent with the provisions of the creating conveyance.' " *Id.* In the case at hand, the trial court concluded as a matter of law that the "Defendants may cross over Plaintiffs' land so long as their use is reasonable and does not interfere with Plaintiffs' reasonable use." We believe the above-quoted authority shows that the trial court erred in the latter part of its above-quoted legal conclusion. While the appellants' use of their easement must be reasonable, its use is not limited because of any interference with the appellees' use of their land. Stated another way, the appellants' use of their easement, according to its terms, is dominant over the appellees' use of the servient tenement.

"One who purchases land burdened with an open and visible easement is charged with notice of the same, and the estate he purchases is servient to the easement." *Johnson v. Mays*, 216 Neb. 890, 896, 346 N.W.2d 401, 405 (1984).

An easement is usually defined as a right in the owner of one parcel of land, by reason of such ownership, to use

the land of another for a special purpose not inconsistent with the general property right of the owner. . . . The owner of the easement may make use of it only for the special purpose that gave rise to the easement itself.

(Citation omitted.) *Paloucek v. Adams,* 153 Neb. 744, 747, 45 N.W.2d 895, 897 (1951).

■ While no case in this jurisdiction has answered this question directly, several cases hold that the property owner's use must bow to the easement holder's legitimate use of the property consistent with the easement's purpose. "The servient owner of land subject to an easement may make such use of it as he sees fit, subject only to the right of the dominant owner of the easement to use it for the purposes out of which the right arose." *Jurgensen v. Ainscow,* 155 Neb. 701, 710, 53 N.W.2d 196, 201 (1952) (involving prescriptive easement). Accord *Hopkins v. Hill,* 160 Neb. 29, 68 N.W.2d 678 (1955) (prescriptive easement). "The servient owner may make any use of it that he cares to make so long as he does not interfere with the rights of the dominant owner of the easement." *Paloucek,* 153 Neb. at 747, 45 N.W.2d at 897. See, also, *Nemaha Nat. Resources Dist. v. Village of Adams,* 207 Neb. 827, 301 N.W.2d 346 (1981) (holding that generally grant of easement over land does not preclude grantor from using land in any manner which does not unreasonably interfere with special use for which easement was acquired).

In *Graves v. Gerber,* 208 Neb. 209, 302 N.W.2d 717 (1981), the plaintiff had an easement to use part of the defendant's driveway for ingress and egress to a garage on the plaintiff's property. After the defendants erected a fence on the driveway— in which they left a 16-foot gap for plaintiff—the plaintiff's use of the easement was possible, but more difficult. The *Graves* court affirmed the trial court's order requiring the defendant to remove the fence as an unreasonable obstruction to the plaintiff's easement. The servient estate owner (defendant) argued that the easement holder (plaintiff) had access to the garage in question through the alley as well as via the easement, but this argument was ignored in favor of enforcement of the easement via the driveway. In our case, the trial court suggested that the appellants plant wheat on their land, which in the trial court's opinion would have the effect of modifying the appellants' need

for access to their land to a time of the year when the appellees' irrigation needs would not interfere with the appellants' need for access. Given the Nebraska Supreme Court's reaction to the servient estate owner's argument in *Graves*, this holding is clearly in error.

In *Paloucek, supra*, the Nebraska Supreme Court affirmed the trial court's order requiring the servient landowner to allow the dominant landowner to bring in machinery to maintain the drainage ditch for which the dominant owner owned an easement. *Paloucek* stated that the servient landowner could not deny the right to enter and use the land found to be within the scope of the easement. The court would not allow the servient owner to fence the land so as to interfere with or defeat the easement. Specifically, the *Paloucek* court stated that the servient landowner "may farm or pasture the land subject to the easement, but such use is necessarily subject to the right of [the owner of the easement] to operate and maintain the ditch." 153 Neb. at 747, 45 N.W.2d at 897.

In this case, we find that the use of the irrigation system clearly interferes with and obstructs the appellants in the use of their easement. The written easement grants the appellants the right of ingress and egress over the north 30 feet of what we have called the south property by any mode of transportation desired by the appellants, including all farm machinery and equipment. That right is not limited by any use the appellees might develop on their real estate; rather, the appellees' use of the south property is limited by the appellants' reasonable use of the easement. This is contrary to the trial court's conclusion that the appellees can use their real estate for any farming purpose they desire. There is no suggestion that the appellants were using their real estate in an unreasonable manner by raising the crops or keeping livestock on the east property.

The record clearly shows that the appellees have blocked the easement area by having the irrigation system thereon and by having the system cross the easement area when the height of that system interferes with the appellants' travel. This conduct will continue to interfere with the appellants' obtaining access to their land by any mode of transportation the appellants might reasonably use to farm their land. It is clear that irrigating the

easement area, or part of it, to the extent that the appellants cannot drive across it with any reasonable mode of transportation or equipment they desire in the use of their land is an unreasonable interference with the language of the easement grant. The appellants have the right to do so at all reasonable times for the activities in which they engage on their land. The appellees' use of the south property since the tree and fence line were removed therefore violated the appellants' easement. As presently existing, it is doubtful if the appellees can irrigate the south property without interfering with the appellees' use of their easement, at least as the evidence shows the appellees have operated the system since 1995. Of course, parking a pickup on the easement by the appellants is not a reasonable use, as would be true of any act of the appellants which is not for the purposes specified in the easement.

## CONCLUSION

For the reasons stated, we modify the order of the trial court and find that the appellees should be enjoined from operating the center-pivot irrigation system or otherwise farming their land in such a manner as to interfere with the appellants' use of their 30-foot easement access and that the costs of these proceedings should be taxed to the appellees.

AFFIRMED AS MODIFIED.