R & S INVESTMENTS, A PARTNERSHIP, APPELLANT, V. AUTO AUCTIONS, LTD., A NEBRASKA CORPORATION, APPELLEE.

725 N.W.2d 871

Filed December 19, 2006. No. A-04-1098.

Terry K. Barber for appellant.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., for appellee.

INBODY, Chief Judge, and MOORE and CASSEL, Judges.

MOORE, Judge.

## INTRODUCTION

R & S Investments (R&S) holds an easement on the property of Auto Auctions, Ltd., for the use of two sanitary sewer lagoons and all necessary piping and connections to the lagoons. After acquiring the property on which R&S' easement lies, Auto Auctions relocated the easement by filling one of the original lagoons with dirt, constructing a new lagoon for use by both property owners, and providing R&S with the necessary connections to the new lagoon. R&S filed suit against Auto Auctions and Phil B. Durst, the president of Auto Auctions, in the district

court for Lancaster County, Nebraska, seeking a declaration of the parties' rights with respect to the easement, restoration of the original lagoon to its condition prior to being filled with dirt, and an injunction enjoining the defendants from interfering with R&S' use of the easement. George R. Day and Barbara D. Day, predecessors in interest to both R&S and Auto Auctions, were later named as third-party defendants. During trial, Durst was dismissed as an individual defendant. The district court entered judgment in favor of R&S, but it found that R&S was not entitled to the relief it sought. The court found R&S was entitled to have the relocated easement set forth in a new conveyance from Auto Auctions and ordered Auto Auctions to execute such new conveyance. The court subsequently dismissed the third-party complaint. For the reasons set forth herein, we affirm.

## BACKGROUND

R&S and Auto Auctions are the owners of certain adjacent tracts of real property located in Lancaster County. Both tracts were originally owned by the Days. The property was then partitioned by the Days and sold. The Days sold the tract currently owned by R&S (Lot 32) to Skelly Oil Company in 1966. R&S acquired title to Lot 32 in 1983. The Days sold the other tract (Lot 31) to Auto Auctions in 2001.

At the time of their conveyance of Lot 32 to Skelly Oil, the Days executed an agreement granting an easement across Lot 31 to Skelly Oil "for a sanitary sewer lagoon and all necessary piping and connections thereto and [agreeing] to construct said lagoon for [Skelly Oil]." The agreement provided:

1. [The Days agree] to construct a sanitary sewer lagoon system on property owned by [the Days], said lagoon to be located no more than 500 feet from the south or east property lines of the parcel . . . conveyed to [Skelly Oil].

2. [The Days agree] that [Skelly Oil], its agents or employees, or any persons or entities under contract with it may enter onto said premises for the maintenance of said lagoon and for the purpose of constructing all portions thereof not agreed to be constructed by [the Days].

3. [Skelly Oil] agrees to provide its own piping from said lagoon to be constructed by [the Days] to the property line of [Skelly Oil].

4. [The Days agree] that said sanitary sewer lagoon to be constructed by [the Days] shall be constructed and built in accordance with the plans and specifications prepared and approved by [Skelly Oil] and presented to [the Days] for said purpose. [The Days agree] to begin said construction within ten (10) days after said plans and specifications are so presented by [Skelly Oil].

5. [The Days agree] to grant a permanent easement no less than 15 feet in width across [the Days'] property for the location, installation, maintenance and repair of the necessary pipes and fittings from [Skelly Oil's] property . . . to the location of said sanitary sewer lagoon, as well as an easement covering the property owned by [the Days] where said lagoon is located, authorizing [Skelly Oil's] continued use of said property for the maintenance and operation of a sanitary sewer lagoon.

[6]. The legal description of the property to be covered by said easements shall be prepared by [Skelly Oil] at its sole expense.

The lagoon, consisting of two separate cells, was constructed per the agreement between the Days and Skelly Oil sometime in the late 1960's and was in use by R&S at the time of Auto Auctions' purchase of Lot 31.

In October 2001, counsel for the Days corresponded with R&S, indicating the pending purchase of Lot 31 by Auto Auctions and the Days' intent to close the lagoon based upon alleged concerns of the Nebraska Department of Environmental Quality (DEQ). The sale of Lot 31 to Auto Auctions took place in November 2001. A condition of the purchase agreement between the Days and Auto Auctions was that the Days were to relocate the lagoon and remove the easement from Lot 31 at the Days' expense. Although the Days did not remove the old lagoon or the easement, Auto Auctions proceeded with the purchase of Lot 31.

The south cell of the old lagoon was filled in with dirt in approximately March 2002. In April, a sewerline was installed running from the old lagoon to the new lagoon. During its construction, the new line was plugged and the sewage from Lot 32 continued to flow into the north cell of the old lagoon. Later in

2002, the plug was removed from the new sewerline, at which time the sanitary waste from Lot 32 began flowing to the new lagoon. The construction of the new lagoon and sewerline was completed at the expense of Auto Auctions. The new lagoon is located approximately 900 to 1,000 feet from the nearest corner of Lot 32.

R&S filed the present action against Auto Auctions and Durst on June 6, 2002. R&S alleged that the defendants, knowing that R&S had an easement expressly granted by deed, had interfered with R&S' use of such easement by filling part of the old sanitary sewage lagoon with dirt, reducing the capacity of the lagoon, and hindering R&S from full enjoyment of the lagoon as originally constructed. R&S sought an order declaring its rights as owner of the dominant estate to an easement for use of, access to, and maintenance of the lagoon which existed at the time R&S acquired title to the dominant estate and declaring Auto Auctions' land servient to R&S' estate. R&S also sought an order requiring the defendants to restore the lagoon to its condition prior to the time the defendants began filling the lagoon with dirt. Additionally, R&S sought an order enjoining the defendants from interfering with R&S' enjoyment of the easement for access to and use and maintenance of the old lagoon. R&S also asked for reimbursement of costs and such other relief as the court deemed just.

At some point prior to trial, the Days were named as third-party defendants in the case. The matter was bifurcated, and trial was held before the district court on December 9 and 10, 2003, with respect to the petition filed by R&S.

Evidence was presented at trial concerning the use and maintenance of the old lagoon and the construction and capacity of the new lagoon. Evidence was also presented concerning a meeting between Durst, the president of Auto Auctions, and a partner in R&S to discuss the old lagoon. The record shows that Durst proposed the construction of a new lagoon on Lot 31 for the disposal of waste from both Lots 31 and 32. The evidence is conflicting as to whether the partner in R&S "voiced no opposition or objection to this plan." There is nothing in the record to suggest that the disposal of waste from Lot 32 was interrupted in any way by the construction of the new lagoon or that, as of

the time of trial, the new lagoon had proved in any way to be inadequate for the disposal of waste from either lot.

The district court heard testimony from Jeremy Williams, an employee of Design Associates, the firm employed by Auto Auctions to design and construct the new lagoon. Williams testified that typically a lagoon is designed for a maximum "life" of 20 years, after which time liquid would need to be pumped from the lagoon and the sludge disposed of before continued use. Williams testified that considerations in designing the new lagoon included the flow rate of water coming into the lagoon from the contributing source or sources, as well as rates of precipitation, seepage of water from the bottom of the lagoon, and evaporation. Williams testified that there are restrictions on the allowable rate of seepage because of the danger of ground water contamination. Williams testified that one-eighth of an inch per day is the "maximum speed" allowed at which wastewater can leave a lagoon.

Williams testified that in the original calculations by Design Associates, a zero seepage rate was used because Design Associates did not receive clarification from the DEQ as to the particular seepage rate that the DEQ would require on the project. The original calculation also contemplated a waterflow rate into the new lagoon of 825 gallons per day and considered that the new lagoon would be used only by Auto Auctions. The rate of 825 gallons per day was derived from water bills for the previous business facility located on Lot 31, using an average rate over approximately 6 months. The calculations also contemplated that the new facility on Lot 31 would double its business in the first 5 years and maintain that level of business for the remaining 15 years of the life of the new lagoon. The calculations resulted in a design calling for a new lagoon of over 26,000 square feet.

Williams testified that plans were resubmitted for the new lagoon in order to accommodate input of wastewater from both Lots 31 and 32. The new calculations assumed a seepage rate of one-sixteenth of an inch per day, halfway between the "two extremes that are allowed." Design Associates contemplated waterflow from Lot 32 of 600 gallons per day, which figure was derived from a flowmeter installed on the well for Lot 32 over a period of about 2 to 3 months. Williams testified that due to the

different seepage rate used, the new calculations encompassing wastewater input from both properties yielded a required lagoon size of approximately 23,000 square feet. Nonetheless, the new lagoon was constructed based on the dimensions originally calculated of over 26,000 square feet. Williams testified that the design of the new lagoon was specifically intended to meet all of the requirements for both properties and, as he understood it, had sufficient capacity to meet those requirements. Williams testified that because the size of the lagoon as constructed was greater than required by the new calculations, the new lagoon might have sufficient capacity to accommodate input of an additional 400 gallons of water per day from Lot 32, still assuming a seepage rate of one-sixteenth of an inch per day, but that the question of whether the new lagoon would accommodate such additional input from Lot 32 would be "fairly close."

Curtis Christiansen, an employee of the DEQ, was involved in reviewing the plans for the new lagoon submitted by Design Associates and in investigating the condition of the old lagoon. Christiansen said that the DEQ had several concerns about the proper construction and operation of the old lagoon, including whether it had "proper separation between ground water and the bottom of the lagoon." Christiansen was asked to answer a hypothetical question concerning a two-cell lagoon, constructed approximately 40 years ago, with maintenance problems throughout its life; with weeds, trees, and other vegetation growing on the sides and bottom of the lagoon; and with one cell being unused for a substantial period of time. Christiansen testified that such a lagoon would likely no longer function properly under the rules and regulations of the DEQ.

The individual who laid the new pipeline to connect Lot 32 to the new lagoon was also involved in closing the old lagoon. He testified that before the south cell of the old lagoon was filled in, he ensured that the sewage from Lot 32 would divert to the north cell. He cleaned out the "channel" so water would flow into the north lagoon and used a skid loader to clean the weeds from the bottom of the north cell.

The district court entered judgment in favor of R&S on R&S' petition on May 14, 2004. In ruling on the matter, the court found the approach and reasoning of the Supreme Court of Colorado

in *Roaring Fork Club, L.P. v. St. Jude's Co.*, 36 P.3d 1229 (Colo. 2001), persuasive and appropriate to use in the present case and found that the Restatement (Third) of Property: Servitudes § 4.8(3) (2000) should apply. The court found:

> [C]hanges [Auto Auctions] made in relocating the lagoon were reasonable and done to permit normal use and development of its property. All expenses associated with relocating the lagoon and connecting [R&S] to it were born by [Auto Auctions] and . . . the relocation did not lessen the utility of the easement, increase [R&S'] burden's [sic] with respect to its use and enjoyment or frustrate the purpose for which the easement was created.
>
> [R&S] is not entitled to the relief it seeks. At most it is entitled to have the relocated easement set forth in a new conveyance from [Auto Auctions]. The document conveying the relocated easement should set forth the rights and responsibilities of the parties respecting the relocated easement consistent with the Restatement. In my judgement an easement as described by [Auto Auctions] in its Offer to Compromise would be appropriate and [Auto Auctions] is ordered to execute said easement.
>
> Because I am ordering some relief I believe I need to enter judgement for [R&S]. It is customary to tax costs to the party against whom a judgement has been entered. In this case, however, I believe it appropriate that the costs of this action be taxed to [R&S]. This is a lawsuit that never had to be brought. The relief I am granting is no more than what [Auto Auctions] told [R&S] it proposed to do in August of 2001 and [that] to which [R&S], at the time, voiced no objection. Restoring the pre-existing lagoons to the same condition they were in just before they were relocated is, in all probability, an impossibility given current DEQ requirements. Even if that were not the case, [R&S'] insistence that [Auto Auctions] do so, when there is no evidence it had been harmed in any way by the relocation of the lagoon[,] was, in my judgement, completely unreasonable.

The court stated that any further relief requested by R&S from Auto Auctions or by Auto Auctions from R&S not specifically

granted by the court's order was denied. The court gave Auto Auctions 30 days to file a motion to set the third-party petition for trial before the petition would be dismissed.

The district court entered an order on September 7, 2004, dismissing the third-party petition. R&S subsequently perfected its appeal to this court.

## ASSIGNMENTS OF ERROR

R&S asserts, consolidated and restated, that the district court erred in (1) making certain findings of fact, (2) determining the proper remedy in this case, and (3) taxing costs to R&S.

## STANDARD OF REVIEW

■ An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute. *Smith v. City of Papillion*, 270 Neb. 607, 705 N.W.2d 584 (2005).

■ An action for injunction sounds in equity. *Denny Wiekhorst Equip. v. Tri-State Outdoor Media*, 269 Neb. 354, 693 N.W.2d 506 (2005). In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Rauscher v. City of Lincoln*, 269 Neb. 267, 691 N.W.2d 844 (2005).

## ANALYSIS

*Findings of Fact.*

R&S asserts that the district court erred in making certain findings of fact. Specifically, R&S asserts that the court erred in finding that (1) the original lagoon was inadequate, (2) R&S voiced no opposition to Auto Auctions' plans to construct a new lagoon, (3) R&S suffered no damage due to Auto Auctions' actions, (4) Auto Auctions' actions resulted in reasonable changes in the easement, and (5) restoration of the original lagoon was impossible. To the extent that the district court made these findings of fact based upon conflicting evidence, we give weight to

the fact that the court observed the witnesses and accepted one version of the facts over another. See *Rauscher v. City of Lincoln, supra.* In general, these findings are consistent with our own de novo review of the record, and we decline to disturb these factual findings on appeal.

*Remedy.*

R&S asserts that the district court erred in determining the proper remedy in this case. More specifically, R&S asserts that the court erred in finding that the proper remedy was the convey- ance of a new easement rather than the injunctive relief requested.

R&S directs our attention to the Restatement (Third) of Property: Servitudes § 8.3(1) at 492-93 (2000), which provides as follows:

> A servitude may be enforced by any appropriate remedy or combination of remedies, which may include declaratory judgment, compensatory damages, punitive damages, nom- inal damages, injunctions, restitution, and imposition of liens. Factors that may be considered in determining the availability and appropriate choice of remedy include the nature and purpose of the servitude, the conduct of the par- ties, the fairness of the servitude and the transaction that created it, and the costs and benefits of enforcement to the parties, to third parties, and to the public.

The district court in this case found that R&S was entitled to have the relocated easement set forth in a new conveyance from Auto Auctions and ordered Auto Auctions to execute such a conveyance. In reaching this conclusion, the court found the approach and reasoning of the Supreme Court of Colorado in *Roaring Fork Club, L.P. v. St. Jude's Co.,* 36 P.3d 1229 (Colo. 2001), persuasive and appropriate to use in the present case. In *Roaring Fork Club, L.P.,* the Colorado court adopted the Restatement, *supra,* § 4.8(3), as the correct statement of con- trolling legal principle for purposes of analyzing a case involv- ing a ditch easement relocation or alteration.

The Restatement, *supra,* § 4.8(3) at 559, provides:

> Unless expressly denied by the terms of an easement . . . the owner of the servient estate is entitled to make reasonable changes in the location or dimensions of an easement, at the

servient owner's expense, to permit normal use or development of the servient estate, but only if the changes do not
> (a) significantly lessen the utility of the easement,
> (b) increase the burdens on the owner of the easement in its use and enjoyment, or
> (c) frustrate the purpose for which the easement was created.

A comment to this section further discusses the servient owner's right to change the location or dimensions of an easement and provides in relevant part:

> This rule applies unless expressly negated by the easement instrument. If the purchaser of an easement wishes to retain control over any change in location, the instrument should be drafted to accomplish that result.
>
> This rule is designed to permit development of the servient estate to the extent it can be accomplished without unduly interfering with the legitimate interests of the easement holder. It complements the rule that the easement holder may increase use of the easement to permit normal development of the dominant estate, if the increase does not unduly burden the servient estate. [Citation omitted.] This rule is not reciprocal. It permits unilateral relocation only by the owner of the servient estate; it does not entitle the owner of the easement to relocate the easement. The reasons for the rule are that it will increase overall utility because it will increase the value of the servient estate without diminishing the value of the dominant estate and it will encourage the use of easements and lower their price by decreasing the risk the easements will unduly restrict future development of the servient estate. In addition, permitting the servient owner to change the location under the enumerated circumstances provides a fair trade-off for the vulnerability of the servient estate to increased use of the easement to accommodate changes in technology and development of the dominant estate.

Restatement (Third) of Property: Servitudes § 4.8 comment *f.* at 563 (2000).

Nebraska case law provides that the owner of a servient estate and the owner of a dominant estate enjoy correlative rights

to use the subject property, and the owners must have due regard for each other and should exercise that degree of care and use which a just consideration for the rights of the other demands. *Kovanda v. Vavra*, 10 Neb. App. 486, 633 N.W.2d 576 (2001). This court has found that an owner whose land is burdened with a right-of-way, unless he or she has expressly agreed to the contrary, may use the land over which the way passes in any manner which does not materially impair or unreasonably interfere with its use as a way. *Id.* Nebraska case law provides further that the use of the servient owner must be reasonable and not such as will injure, impair, or obstruct the enjoyment of the way by the grantee or subject him or her to extra labor and expense in keeping it in repair, and the owner of the way may restrict such use by the owner of the servient tenement as is inconsistent with the enjoyment of the easement. *Id.* The extent of an easement created by a specific grant is fixed by the conveyance, and the meaning thereof is to be found in its language construed in the light of relevant circumstances. *Id.* The possessor of land subject to an easement created by a conveyance is privileged to make such uses of the servient tenement as are not inconsistent with the provisions of the creating conveyance. *Id.* An easement is usually defined as a right in the owner of one parcel of land, by reason of such ownership, to use the land of another for a special purpose not inconsistent with the general property right of the owner. The owner of the easement may make use of it only for the special purpose that gave rise to the easement itself. *Id.* A servient owner of land subject to an easement may make such use of it as he or she sees fit, subject only to the right of the dominant owner of the easement to use it for the purposes out of which the right arose. *Id.*

 The rule set forth in § 4.8 of the Restatement, *supra*, is not inconsistent with these principles of Nebraska law. An injunction is an extraordinary remedy and ordinarily should not be granted except in a clear case where there is actual and substantial injury. *Lambert v. Holmberg*, 271 Neb. 443, 712 N.W.2d 268 (2006). Such a remedy should not be granted unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice. *Id.* An adequate remedy at law means a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt

administration as the remedy in equity. *Id.* Given the nature of the easement in question and the uncertain continued viability of the old lagoon, we conclude that the district court did not err in applying the Restatement (Third) of Property: Servitudes § 4.8 (2000) in resolving this case, rather than granting the injunctive relief requested by R&S.

The easement in the present case was conveyed to Skelly Oil by the Days in 1966. The conveyance document provides that the easement was for a sanitary sewer lagoon and all necessary piping and connections thereto. Although the conveyance provides that the Days were to construct a lagoon on their property "to be located no more than 500 feet from the south or east property lines of the parcel," the right to move the location of the easement is not expressly denied by the terms of the document. There is nothing in the conveyance document specifying that the grantee, Skelly Oil, wished to retain control over any change in location of the easement. We agree with the district court's assessment that the changes Auto Auctions made in relocating the lagoon were reasonable, especially given the environmental concerns. The record shows that the changes were made at Auto Auctions' expense and were done in the interest of normal development of the servient estate. There is nothing in the record to show that the changes significantly lessen the utility of the easement, increase the burdens on R&S in its use and enjoyment of the easement, or frustrate the purpose for which the easement was created. See Restatement, *supra*, § 4.8(3). The original easement was granted in order to provide R&S' predecessor the use and enjoyment of a sanitary sewer lagoon and all the necessary piping and connections thereto located on what is now Auto Auctions' property. The remedy fashioned by the district court ensures that R&S still has an easement for the use and enjoyment of a sanitary sewer lagoon on Auto Auctions' property with all the necessary connections. While the new lagoon is farther away from R&S' property than the old lagoon, R&S has not shown that the new lagoon is inadequate to meet its needs. The record also shows that continued viability of the old lagoon was in question. We conclude that the district court did not err in ordering the conveyance of a relocated easement or in failing to grant the relief requested by R&S.

*Taxation of Costs.*

R&S asserts that the district court erred in taxing costs of the action to R&S. Neb. Rev. Stat. § 25-1708 (Reissue 1995) provides that "[w]here it is not otherwise provided by this and other statutes, costs shall be allowed of course to the plaintiff, upon a judgment in his favor, in actions for the recovery of money only, or for the recovery of specific real or personal property." Neb. Rev. Stat. § 25-1711 (Reissue 1995) provides, in relevant part, that "[i]n other actions the court may award and tax costs, and apportion the same between the parties on the same or adverse sides, as in its discretion it may think right and equitable." In equity actions, taxation of costs rests in the discretion of the trial court. *Hein v. M & N Feed Yards, Inc.*, 205 Neb. 691, 289 N.W.2d 756 (1980); *Ehlers v. Campbell*, 159 Neb. 328, 66 N.W.2d 585 (1954). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *City of Lincoln v. Realty Trust Group*, 270 Neb. 587, 705 N.W.2d 432 (2005). The present action, of course, is an equity action, and we find no abuse of discretion in the district court's taxation of the costs of this action to R&S.

## CONCLUSION

We decline to disturb the factual findings of the district court. The district court did not err in ordering the conveyance of a relocated easement or in failing to grant the relief requested by R&S. The district court did not abuse its discretion in taxing costs to R&S.

AFFIRMED.