Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/10/2023 09:05 AM CST

Tad J. Melia and Janel K. Melia, Cotrustees
of the Tad & Janel Melia Trust, appellees
and cross-appellants, v. Randy L. Hansen,
appellant and cross-appellee.

___ N.W.2d ___

Filed January 10, 2023.    No. A-22-229.

1. **Easements: Equity.** An adjudication of rights with respect to an easement is an equitable action.
2. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court. But when credible evidence is in conflict on material issues of fact, the court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.
3. **Easements.** There is a two-step analysis to determine whether a servient estate owner's use of an easement is valid: whether the easement expressly allows it, and if it is unclear, whether it is a reasonable exercise.
4. ____. The owner of the servient estate, which is the land that has the easement, and the owner of the dominant estate, which is the person who has rights to use the easement to access the land, share correlative rights to the easement property.
5. **Easements: Equity.** Equity will not restrict the servient estate's use of the land, if the dominant estate receives all the uses it is entitled to under the easement agreement. But the servient estate cannot interfere with the dominant estate's ability to use, maintain, or repair the easement or increase the risks to exercise the easement rights.
6. **Injunction.** Ordering an injunction provides an extraordinary remedy and should be granted only when there is actual and substantial injury.

7. ____. The right that would be violated without an injunction must be clear, the damage must be irreparable, and a remedy at law would be inadequate to prevent a failure of justice.

8. **Trespass: Injunction: Equity.** Where an injury is at risk of repetition, equity looks to the nature of the injury instead of the magnitude of damage when affording relief.

9. **Equity.** Under the doctrine of unclean hands, a person cannot obtain relief in a court of equity if he or she acted inequitably, unfairly, or dishonestly to the controversy at issue.

10. **Pleadings: Appeal and Error.** The doctrine of unclean hands is an affirmative defense. An affirmative defense must be pleaded to be considered by the trial court and appellate court.

Appeal from the District Court for Howard County: KARIN L. NOAKES, Judge. Affirmed as modified.

Rodney M. Wetovick, of Wetovick Law Office, for appellant.

Barry D. Geweke, of Stowell, Geweke & Piskorski, P.C., L.L.O., for appellees.

MOORE, RIEDMANN, and BISHOP, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Randy L. Hansen appeals an order from the Howard County District Court which permanently enjoined him and his successors from gating, fencing, or otherwise obstructing an easement on his property granted to an adjoining property owner. The adjoining property owners cross-appeal the order to request a correction of the party names in the district court's order. After a de novo review of the record, we affirm the district court's order as modified to correct the party names.

## BACKGROUND

The dispute in this case arises from a stipulated easement entered into during the course of a 2001 lawsuit between

Hansen and Janet M. Melia and Dale Melia, who owned the subject property at the time (Melia Land). Hansen sued Janet and Dale, seeking a temporary injunction and to quiet title on a strip of land originally platted as a part of the North Loup River. See *Hansen v. Melia*, No. A-02-811, 2003 WL 21447557 (Neb. App. June 24, 2003). Janet and Dale counterclaimed, asserting claims for quiet title and implied easement. The legal description for the Melia Land is Lot 3, Section 18, Township 15 North, Range 9 West of the 6th P.M., Howard County, Nebraska. In practical terms, the Melia Land is a trapezoid-shaped piece of land between the North Loup and Middle Loup Rivers where the two rivers converge to a point to become the Loup River. The 2001 lawsuit involved a dispute as to the northern boundary of the Melia Land because the North Loup River avulsed, leaving open ground that was previously underwater.

The legal description for Hansen's land is Lots 3, 4, 5, and 6, Section 7, Township 15 North, Range 9 West of the 6th P.M., Howard County, Nebraska. In practical terms, Hansen's land runs along the north side of the North Loup River to the confluence point, almost parallel to the Melia Land on the opposite side of the North Loup River. The disputed area was north of the North Loup River and includes the only point of access to the Melia Land.

As a result of the 2001 lawsuit, the court established the boundary between the two properties consistent with that offered by Janet and Dale and rejected Hansen's claim of ownership as to the disputed land. As pertinent to the present lawsuit, during the trial of the 2001 lawsuit, the parties stipulated to an implied easement over a road on Hansen's property in order to gain access to the Melia Land. The district court approved the stipulation and ordered that Janet and Dale had an easement to use the road on Hansen's property to access their property. This court affirmed the district court's order. See *Hansen v. Melia, supra*.

Subsequently, Janet and Dale conveyed the Melia Land to their son, Tad J. Melia, in 2014. Tad conveyed the land to the Tad & Janel Melia Trust (the Melias) that same year. The present lawsuit involves the use of the easement established as a result of the 2001 lawsuit; therefore, we provide the following detail.

The easement is an access road that extends from a county road and is used to access the Melia Land, as well as land west of the Melia Land owned by Ron McBride. The access road runs north to south, then veers southeast. Hansen owns the land to the east of the access road and rents the property to the west, which is the "Inman property." The access road leads through Hansen's property and into the Bureau of Land Management (BLM) land. The road cuts through 3 acres of the BLM land, before it reaches the Melia Land. A person driving down the access road will encounter three gates: the north Hansen gate, the south Hansen gate, and the Melia gate, which is on the BLM land, but is owned by the Melias.

To the east of the access road is the south bottom field, which essentially runs the length of the access road from the north Hansen gate to the south Hansen gate. Hansen farms corn and soybeans on the south bottom, then he pastures his cattle to clear the stalks in the beginning of winter. The length of time the cattle spend clearing the stalks depends on the amount of cattle Hansen has, but their stay usually ranges between 1 to 3 weeks. When his cattle finish with the south bottom field, Hansen moves them to the Inman property. To make this transfer, Hansen must lead the cattle through the gates, around a corner, and through a gate on the Inman property. Once the cattle are moved to the Inman property, Hansen takes down both gates.

The Melias sued Hansen to obtain a permanent injunction prohibiting Hansen from obstructing the access road and a declaratory judgment determining that the gates and cattle were an unreasonable and unlawful interference with their

easement rights. Tad offered an alternative that would fence the eastern side of the access road, but Hansen argued that it would be more burdensome than his method. During trial, the parties disputed the facts.

*Hansen's Method.*

Hansen's method to pasturing his cattle in the south bottom is to gate the north entrance of the easement road and allow the cattle to lie on the road. After the BLM barred his access to its land and constructed a fence along the southern border of the south bottom, Hansen began using a south gate on the access road. Hansen argues that his method allows the cattle to bed down on the road. Bedding down on the road can prevent the cattle from sleeping on uneven ground in the field, which could cause the cattle to roll over and die. He also testified that he believes his method results in less work for himself. Hansen's son, James Hansen, testified that the gates allow them to train their cattle to never cross a fence line, which ensures if a fence goes down, the cattle are less likely to escape.

James and his wife, Darlene Hansen, currently work together to manage the cattle. James has been helping his father since he turned 18 years old, and Darlene started helping after she married James in 2009. Prior to 2009, Hansen employed Robert Stevens from 2000 to 2009. Everyone that worked with Hansen testified that they remember him using the north gate before the easement was ordered.

While the cattle are grazing the south bottom field, the Hansens regularly monitor them. They usually check on the cattle up to five times a day. Darlene testified that she checks the fencing three times a day, because of the potential problems with deer near the south bottom field. James testified they check between 10 to 15 miles of electric fence two times a day at the minimum during deer season because of the potential harm deer can cause by running through their fences.

There has always been fencing around the north and east borders for the south bottom field. There has been a fence on the southern border since the BLM barred Hansen from grazing its land. Those fences are in place to keep the cattle from grazing on land not owned by Hansen and consist of either electric wire, barbed wire, or both. All of the Inman property is fenced, including the west side of the access road, which has a barbed wire fence separating it from the access road. The Inman property is significantly larger than the south bottom field, so the cattle stay there for up to 3 months.

*Impact on the Melias.*

The Melia Land currently has a primitive cabin on it. Janet testified that between 2003 and 2014, she did not visit the property often. Janet usually only went to the property for Memorial Day. Tad testified that he went to the cabin many weekends during the winter to trap and hunt. But now, he plans to build a house on the property, which is where he plans to spend winters. Tad also spoke to the steps he has taken to begin building a home on his property, including working with zoning and surveying the land to establish a floor height in accordance with the flood plain.

Tad testified that Hansen's pasturing method interferes with his access to his land. His access is not barred, but it is hindered by Hansen's gates and cattle. The cattle lie across the road, and Tad has to honk to chase them off the road. Additionally, going through the access road during Hansen's pasturing means Tad must open and close two gates to get to his property.

If Tad builds a home on their property, then Hansen's pasturing method could further impact his ability to enjoy his easement rights. McBride, Melias' neighbor to the west who uses the same easement to access his property, testified that when the gates are in place, all of the postal delivery services will leave his deliveries at the gate. Since he has valuable items shipped to him, he now must ship them to Grand Island,

Nebraska, instead. Tad and McBride are also responsible for maintaining the access road. It is their responsibility to clear the snow on it and fill ruts. The additional gates and potential for cattle on the road can complicate these tasks.

*Tad's Solution and Its Impact on Hansen.*

In January 2021, Tad built a fence along the west side of the south bottom field with high tensile wire to block the cattle from the road. Tad testified that he used high tensile wire because it had less of a chance of breaking if a deer runs through it. He explained that he put the fence up because otherwise the cattle stand in the road and he has to honk and chase them off to get to his property. By building the fence, Tad said the gates become unnecessary, thus making it easier for him to access his property. Hansen objected to the fence the day it was built, and shortly thereafter, he had his lawyer send a letter to Tad threatening to take the fence down himself if Tad did not.

Hansen believed Tad's solution would add obstacles to getting his cattle across the road and through the Inman property gate. Tad suggested Hansen could alleviate the problem by putting a gate in the fence on the east side of the access road. However, Hansen, James, and Darlene all disagreed. Hansen testified that Tad's fence and an additional gate created a difficult barrier to easily transfer the cattle to the Inman property. Darlene stated that with the additional fence, she would not know how to turn the cattle around without running them into the marshy area near the BLM land. James also added that they could not run the cattle over the fence, because they train their cattle not to cross downed fence.

The Hansens also believed that fencing the eastern boundary of the access road would make more work for them in their already busy schedule during the few weeks of grazing on the south bottom field. Hansen argued his system is easier, and Tad agreed. Hansen also argued that fencing the west side of the south bottom would cause him to lose crop space.

However, Tad refuted that the fence would not take up enough space to impact Hansen's crops.

Despite Hansen's reluctance to fence the east side of the access road, he had offered to fence it before. In 2019, Hansen suggested to McBride that he would be open to fencing the eastern boundary, but only if he was compensated $10,000 for a 5-year term. Hansen explained that these costs represent the "substantial amount . . . additional time, materials, and frustration of checking" the fence constantly while pasturing the stalks, and the risk of the cattle getting out if a deer runs through the fence. Brief for appellant at 14. Hansen estimated at trial that the fence adds an extra 500 to 600 yards that they would have to check, but Tad testified he believed the fence line to be only 200 yards.

Within a couple of weeks of the eastern fence being built, a deer ran through the fence. Darlene discovered the fence was down in the morning, but it was not fixed until later that afternoon. Hansen eventually took down the fence, wrapped up the materials, and placed them near a tree on the property for Tad to pick up. Hansen argues that when there is only a fence in place that a deer can damage, he runs the risk of his cattle getting out.

Hansen also argued that the Melias constructed a gate on the land owned by the BLM and that this gate restricts his access to land he owns to the east of the BLM land because the Melias keep the gate locked and he does not have a key. The Melia gate is only open and unlocked when Tad is on the land. Neither party has ever discussed providing Hansen with a key to the gate, and Hansen has never requested access. However, the Melias have an easement from the BLM to cross its land and permission from it to erect and maintain the gate, whereas Hansen does not have an easement to access the BLM land. Without an easement and a key to the Melia gate, Hansen stated he feels blocked from his own land. The district court commented on the record that it believed this to be a dispute with the BLM, not the Melias.

*District Court's Ruling.*

The district court ruled in favor of the Melias, holding that placement of gates and a fence across the easement materially interferes with the easement's use. The district court ordered a permanent injunction that prevents Hansen and his successors from fencing, gating, or otherwise obstructing the Melias' easement. In reaching its decision, the court determined that the stipulation granting the easement made "clear that the easement property is a road and that the scope of the easement allowed the use of the road to access Melia's property." However, it also recognized that the language of the easement was silent regarding the installation of fences or gates across the roadway. Therefore, the court engaged in a balancing test between the rights of each party and concluded that Hansen had reasonable alternatives to gating the roadway that are not unduly burdensome. Hansen appeals.

## ASSIGNMENTS OF ERROR

Hansen assigns, restated, that the district court erred in (1) determining that his pasturing method for the south bottom field was an unreasonable interference, (2) making incorrect or speculative factual findings that impacted its decision, (3) imposing the permanent injunction based on its incorrect factual findings and without considering less restrictive alternatives or options, and (4) failing to acknowledge the Melias' unclean hands.

On cross-appeal, the Melias assign that the district court incorrectly defined the owners of the property on which the easement passes.

## STANDARD OF REVIEW

[1,2] An adjudication of rights with respect to an easement is an equitable action. *Homestead Estates Homeowners Assn. v. Jones*, 278 Neb. 149, 768 N.W.2d 436 (2009). On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is

obligated to reach a conclusion independent of the conclusion reached by the trial court. *Lambert v. Holmberg*, 271 Neb. 443, 712 N.W.2d 268 (2006). But when credible evidence is in conflict on material issues of fact, the court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Homestead Estates Homeowners Assn., supra.*

## ANALYSIS

No party disputes the validity of the easement; rather, Hansen argues that the district court incorrectly determined that his method of pasturing, including erecting gates across the easement, was an unreasonable and material interference of the Melias' easement rights. He also argues that the district court's factual findings were contrary to the evidence and that the district court should have considered ordering alternatives to his pasturing method, instead of issuing an injunction. Finally, he argues that the Melias' gate erected on the BLM land restricts his access to his own property and that due to the Melias' "unclean hands," they are not entitled to an injunction. The Melias cross-appeal and contend that the district court incorrectly identified the parties in its order. We take up each argument as follows.

### Hansen's Method Is Unreasonable Interference.

[3] There is a two-step analysis to determine whether a servient estate owner's use of an easement is valid: whether the easement expressly allows it, and if it is unclear, whether it is a reasonable exercise. Restatement (Third) of Property: Servitudes, § 4.9 (2000). In the present case, the purpose of the easement was to provide access to the Melia Land. Hansen does not dispute the district court's determination that the specific language granting the easement does not indicate if a fence or gate is a valid use of the easement land. Since Hansen does not dispute the first step, we begin our analysis with the second step, which balances the rights of the parties in equity

to decide whether Hansen's pasturing method was a material interference and unreasonable use of the easement land.

[4,5] The owner of the servient estate, which is the land that has the easement, and the owner of the dominant estate, which is the person who has rights to use the easement to access the land, share correlative rights to the easement property. See *Kovanda v. Vavra*, 10 Neb. App. 486, 633 N.W.2d 576 (2001). Both parties must have due regard for each other and exercise just consideration for the other's rights and demands. See *id*. Equity will not restrict the servient estate's use of the land, if the dominant estate receives all the uses it is entitled to under the easement agreement. See *id*. But the servient estate cannot interfere with the dominant estate's ability to use, maintain, or repair the easement or increase the risks to exercise the easement rights. Restatement, *supra*.

In *Kovanda v. Vavra, supra*, this court held that an irrigation system interfered with the dominant estate owner's easement rights because the irrigation system made the easement too muddy for a vehicle to cross. The irrigation system overwatered areas of the easement because the servient landowner did not own the necessary land for the irrigation system to make a full circle, so the system would dispense twice as much water on turns. *Id*. The easement's purpose was for ingress and egress to reach the dominant estate owner's property by means of any vehicle, but the mud directly conflicted with that purpose. *Id*. We found the trial court also clearly erred by suggesting that the dominant estate owner could plant wheat to obviate the need for easement access while the servient estate irrigated. *Id*. We concluded that while access was not barred, farming or irrigating both interfered with the dominant estate owner's easement rights by frustrating the easement's purpose. *Id*.

Hansen's pasturing method involves two elements: the north and south gates, and the cattle bedding down on the road. Hansen argues that his method does not interfere with the Melias' easement rights because they can still access their

property and the pasturing of the south bottom takes only 1 to 3 weeks.

Akin to *Kovanda*, Hansen's pasturing method creates a material interference with the Melias' easement access. Hansen is correct that his pasturing method does not prevent the Melias from accessing their land; however, making passage more difficult can still constitute a material interference and unreasonable use. See *Graves v. Gerber*, 208 Neb. 209, 302 N.W.2d 717 (1981) (enjoining servient tenement from gating shared driveway because it made parking in adjacent garage more difficult). Tad must open and close two gates and possibly scare off cattle to travel a few hundred yards to his property. While these obstructions last only from 1 to 3 weeks a year, it remains a material interference because it frustrates the purpose of the easement—which is to access the Melia Land. This is true, especially because the pasturing period usually takes place during the winter, which is when Tad uses the Melia Land the most. It can also interrupt mail and other delivery service, as well as restrict the Melias' ability to maintain and clear the access road. Overall, Hansen's pasturing method is a material interference and unreasonable use, and there are reasonable alternatives available.

Hansen argues alternatively that we should turn to precedent outside of Nebraska to inform our decision on the reasonableness standard. Hansen cites two cases but asks that we use the holdings to draw contrast from the present case based on how those courts defined reasonableness.

Hansen first cites *Tidwell v. Bezner*, 245 P.3d 620 (Okla. Civ. App. 2010), which affirmed a permanent injunction to remove the gates and fencing from an easement. The Oklahoma court prefaced its holding by acknowledging that most jurisdictions allow servient estate owners to put up gates across easements, especially where the land is used for confining cattle or for other agricultural purposes. *Id*. But the *Tidwell* court held that an electric bump gate was an unreasonable interference with the easement because it posed a hazard to users and

damaged vehicles and because there was a reasonable alternative. Hansen argues that *Tidwell* provides a point of distinction because his method involves only "light seasonal use, and even less potential interference." Brief for appellant at 20. But this misstates the standard under *Tidwell*, because each case turns on the circumstances surrounding the easement at issue.

He also relies on *Taylor v. Hiatt*, 279 N.C. App. 506, 865 S.E.2d 331 (2021), which affirmed a trial court's order to remove gates on an easement. Under North Carolina precedent, a servient estate owner can fence an easement as long as it is necessary to the reasonable enjoyment of the land and does not materially impair or unreasonably interfere with the easement's use. *Id*. The gates at issue in *Taylor* were temperamental, would not function well in the cold, and were located well off the road to further make access difficult. Additionally, the servient estate's horses would congregate by the gates, which would complicate passage. *Id*. Hansen asks we adopt the general principles in *Taylor*, which determined that gates alone are not an interference; however, Hansen's request ignores how the circumstances surrounding the easement play into the analysis. The North Carolina Court of Appeals affirmed the injunction because of the circumstances surrounding the easement at issue. See *id*.

Both *Tidwell* and *Taylor* support the district court's ruling, rather than providing Hansen cases for distinction. Both cases evince instances where gating an easement frustrated its purpose when considering the circumstances surrounding its use for access. Neither case supports Hansen's request that we simply inquire whether he had "'sound reasons for using the gates.'" Brief for appellant at 21. Hansen's pasturing method makes access to the Melias' property more difficult. The district court found Tad's testimony about reasonable alternatives credible, which testimony we find persuasive given the conflicting testimony. We agree with the district court's ruling and hold that Hansen's gates and cattle represent material interferences of the Melias' easement rights.

*District Court Did Not Err In Its*
*Findings of Fact.*

Hansen argues that the district court's factual findings were contrary to the evidence before the court, thus revealing a bias in favor of the Melias. Hansen argues that the district court's findings are not based upon fact, so they cannot support its conclusion. In his brief, he points to seven examples in the district court's order that he contends are not supported by the evidence.

After reviewing the facts, the evidence adduced at trial, and the district court's order, we find no reversible error in the court's order. For instance, Hansen contends that the district court made a factual error when it referred to the fence Tad erected as "'deer-resistant' and indicated Hansen had alternatives, meaning [he] could install such a fence" because Tad's fence was nonfunctional. Brief for appellant at 23. However, the court's characterization of Tad's fence as being deer-resistant was contained in the court's fact section and was derived from Tad's testimony that he used "high tensile barbed wire" because of the presence of deer. The court did not indicate that Hansen could install a fence such as that installed by Tad; rather, it noted there were reasonable options available to prevent deer from running through the fence, "such as flagging the fence or building a more deer-resistant fence."

Hansen claims that the district court's conclusions drawn from the evidence were incorrect factual findings. He cites to the district court's statement that his concerns regarding deer running through easement fencing on the east side of the road were speculative. In discussing Hansen's concern, however, the court stated, "There is always a risk of deer damaging fence but Hansen's testimony that they are more likely to run through a fence located on the side of the easement is speculative." We agree.

It was established at trial that Hansen is responsible for 10 to 15 miles of fence line and that deer are a known danger to

the entire area of the south bottom. Even without the eastern fence, Darlene and James both testified to checking the south bottom multiple times a day because of the presence of deer. The district court found Hansen's heightened concern for an east fence to be speculative, given the risk the deer pose to all the other fences the Hansens check regularly.

Hansen also argues that the district court erred by determining there were reasonable alternatives to his pasturing method. In addition to the district court's suggestion that reasonable alternatives could include flagging the fence or making it more deer-resistant, it also suggested using a temporary fence so Hansen would not lose crop space. Whether reasonable alternatives exist is determined by the trier of fact. See *Fiscel v. Beach*, 254 Neb. 678, 578 N.W.2d 52 (1998). The district court concluded that the alternatives may be inconvenient, but the slight inconvenience does not justify significant interference with the Melias' easement rights. While we review factual issues de novo, we can give weight to the district court's determination of credibility where there is a conflict on a material issue. See *Homestead Estates Homeowners Assn. v. Jones*, 278 Neb. 149, 768 N.W.2d 436 (2009). The reasonable alternatives the district court suggested are not burdensome under the facts and are suggestions for Hansen to consider. They are not an exhaustive list of Hansen's options under its order. Accordingly, we affirm the district court's factual findings.

*Issuing Injunction Was Appropriate.*

Hansen also argues that an injunction should not have been imposed because there is no clear and irreparable damage that the injunction is preventing. He asserts that there are a number of alternatives to resolving the issue such as a bump gate or a remote-controlled gate but contends those are not options if the injunction is affirmed.

[6-8] Ordering an injunction provides an extraordinary remedy and should be granted only when there is actual and

substantial injury. See *Harders v. Odvody*, 261 Neb. 887, 626 N.W.2d 568 (2001). The right that would be violated without the injunction must be clear, the damage must be irreparable, and a remedy at law would be inadequate to prevent a failure of justice. See *Central States Found. v. Balka*, 256 Neb. 369, 590 N.W.2d 832 (1999). Where an injury is at risk of repetition, equity looks to the nature of the injury instead of the magnitude of damage when affording relief. See *Lambert v. Holmberg*, 271 Neb. 443, 712 N.W.2d 268 (2006).

Here, the injury is the continued obstruction of the easement to the Melia Land by Hansen's gates and cattle. While the magnitude of damage is low, the repetition of this injury informs why it is necessary. Without the injunction, the Melias will continue to experience a material interference to the enjoyment of their easement rights. As explained above, Hansen interferes with the Melias' rights by requiring them to open and close two separate gates along the path to their property, as well as the potential hazard of cattle lying in the road. Obstructing one's easement rights is a concrete injury. See *Graves v. Gerber*, 208 Neb. 209, 302 N.W.2d 717 (1981).

Hansen's alternatives do not merit consideration because they were not raised at the trial level. An appellate court will not consider an argument that is raised for the first time on appeal. *Eletech, Inc. v. Conveyance Consulting Group*, 308 Neb. 733, 956 N.W.2d 692 (2021). Because Hansen did not raise this issue at trial, we decline to address it.

*Unclean Hands Doctrine Does Not Apply.*

Hansen contends that the Melias have unclean hands because their gate blocks Hansen from a piece of Hansen's property. He explains that "Melia has been excluding Hansen from some of Hansen's property for decades . . . by locking the green gate." Brief for appellant at 25. Hansen believes that since Melia obstructs his path to a piece of his land, "Melia's position is the height of hypocrisy" and "is the definition of unclean hands." *Id*.

[9] Under the doctrine of unclean hands, a person cannot obtain relief in a court of equity if he or she acted inequitably, unfairly, or dishonestly to the controversy at issue. See *Farmington Woods Homeowners Assn. v. Wolf*, 284 Neb. 280, 817 N.W.2d 758 (2012). Conduct that equates to unclean hands is generally fraudulent, illegal, or unconscionable. See *id*.

[10] Hansen's argument was not pled prior to trial. The doctrine of unclean hands is an affirmative defense. See *id*. An affirmative defense must be pleaded to be considered by the trial court and appellate court. *Funk v. Lincoln-Lancaster Cty. Crime Stoppers*, 294 Neb. 715, 885 N.W.2d 1 (2016). At the trial level, the only affirmative defense Hansen raised was laches, which he did not raise again on appeal. Therefore, because it was not raised at trial, we do not need to address it. See *Eletech, Inc. v. Conveyance Consulting Group, supra*.

But even if Hansen had properly pled his unclean hands defense, it still would not apply. Hansen admitted during trial that he had no easement to the BLM land. The BLM had barred him from grazing the land, which was the catalyst to Hansen's installing the south gate. Tad, on the other hand, has an easement over the BLM land, which allows him to keep his gate there. Both parties admit that they have never discussed the Melia gate or discussed exchanging keys to the gate. Tad has not done anything illegal, unconscionable, or dishonest by keeping the gate locked when he is not on the property. There is no evidence Tad used the gate to obstruct Hansen's access. Therefore, the doctrine of unclean hands does not apply.

*Modification of District Court's Order.*

The Melias raise one issue on their cross-appeal: The district court erred in identifying ownership of the land on which the easement is located. We agree.

The district court identified the Melias' easement as follows:

the road on *Plaintiff's* land described as Lots 3, 4, 5, and 6 in Section Seven (7), Township Fifteen (15) North,

> Range Nine (9) West of the 6th P.M., in Howard County, Nebraska to gain access to *Defendant*'s land described as Lot 3, Section 18, Township 15 North, Range 9 West of the 6th P.M., Howard County, Nebraska.

(Emphasis supplied.) The Melias were the plaintiffs in this case, and Hansen owns Lots 3, 4, 5, and 6. The order appears to contain a scrivener's error and should instead read:

> the road on Hansen's land described as Lots 3, 4, 5, and 6 in Section Seven (7), Township Fifteen (15) North, Range Nine (9) West of the 6th P.M. in Howard County, Nebraska, to gain access to the Melias' land described as Lot 3, Section 18, Township 15 North, Range 9 West of the 6th P.M., Howard County, Nebraska.

We modify the order accordingly.

## CONCLUSION

Following a de novo review, we affirm the district court's determination that Hansen's cattle and gates represent a material interference to the Melias' easement rights and that an injunction was necessary. We modify the district court's order to correct proper ownership of the easement as set forth above.

Affirmed as modified.